# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Mark N. Fellenz
PLAINTIFF

V.

CIVAL ACTION

NO. _____

Enkata Technologies
DEFENDANT

04 - 10563 PBS

## AMMENDMENT

### BACKGROUND

1. The following is amended to the above civil action in light of a review of the original Complaint as filed by Mark Fellenz ("CHEWIE"). While entirely accurate, the original Complaint filed against Enkata Technologies ("Defendant") focused on enumerating Defendant's ERISA and COBRA violations at the expense of covering some important facts and background, which are presented below.

2. The core facts of the case are the following: CHEWIE initially became ill in March 2002 and took advantage of the benefits he had been paying for through COBRA. In July 2002, CHEWIE was approved by HealthNet, the original insurer, for specific, additional treatment for his illness and began receiving treatments per Doctor's orders. These treatments were both approved and 100% covered by HealthNet. In September 2002, two things occurred. First, the Doctor's office was 100% reimbursed for treatments delivered in July 2002. Second, CHEWIE received continuing treatment that was approved by HealthNet and *identical to* treatment received in July 2002. It is a fact HealthNet would have covered the September 2002 treatment if it were not for an event

that occurred at a much later date, namely Defendant's decision to conduct a retroactive carrier change. Defendant failed to notify CHEWIE of this change and has ever since failed to properly administer its health insurance plan, failed to see to their fiduciary responsibility to honor benefits, failed to produce any relevant plan documentation and has oddly persisted to do so throughout the 2002-2004 timeframe despite having admitted their fault to the Department of Labor, having either gathered private medical information without consent and / or having conducted a possibly fraudulent 'medical review', and having demonstrated a pattern of gross misconduct that seeks only to evade Defendant's clear fiduciary responsibility. Again, treatment in September 2002 was approved and 100% covered by HealthNet at the actual time of treatment (as treatments had been covered in prior months). It is *only* Defendant's decision to conduct a retroactive carrier change – and nothing else – that has *negatively* impacted CHEWIE'S past benefits, benefits that both were paid for in a timely fashion and were reasonably expected given a clearly established pattern of coverage. Defendant has *regularly* been notified of this situation going back to 2002 and has yet to see to their most basic duties and responsibilities, let alone their core fiduciary responsibility to honor benefits.

3. The following presents some additional facts relevant to the case as well as a somewhat-detailed timeline of events related to this case beginning in 2002 and continuing to the present date.

4. First and most importantly, ERISA guidelines clearly state all appeals must be exhausted before taking legal action. This serves as testament to the fact that all appeals, reasonable and otherwise, have long been exhausted. Appeals were made to the insurer, in fact, no less than three times, and Defendant has been advised of that fact going back to October 2003. Also, innumerable appeals have been lodged with Defendant that Defendant has either subsequently ignored or responded to

with denials of coverage that defy both logic and the facts at hand.

5. A full accounting of appeals with the insurer are the following: Mid-2003 appeal appears to have been automatically triggered by the conditions related to this particular case – appeal denied on July 3, 2003, later in 2003 appeal was made via phone despite being told appeal had already been made and had already been denied – appeal denied, later in 2003 additional appeal was made in writing to make absolutely certain there was no question all appeals had been exhausted – appeal denied again on November 18, 2003. Defendant was apprised in October 2003 that appeals had already been denied (despite the fact the third was forthcoming), and Defendant was advised of Defendant's ultimate fiduciary responsibility to honor past benefits.

6. It should be noted that CHEWIE has initiated all actions to date in an effort to resolve this matter. While the above appeals may have extended into 2003, Defendant has never extended any amount of good-faith to help CHEWIE by simply seeing to their fiduciary responsibility. This is despite Defendant's having admitted their having caused the problem to begin with, a fact Defendant has admitted to the Department of Labor as far back as late 2003. (It is important to note Defendant has *never* admitted *any* amount wrongdoing to CHEWIE. CHEWIE only uncovered Defendant's admission of guilt within the past few days via a response from the Department of Labor in regard to a document request CHEWIE submitted in early February 2003.) Defendant's admission was expressed to the Department of Labor and is amended to the original Complaint in another Amendment.

7. Aside from CHEWIE'S efforts going back to late 2002 to simply understand the growing problem of unfulfilled coverage, appeals have repeatedly been lodged with Defendant to no avail. Thus far

there has been no explanation offered for Defendant's denial of benefits that reconciles with the facts that treatment was both 1) approved and 2) covered by the plan actually in place at the time of treatment. Defendant's standing explanation is to effectively state 'we are not responsible as such treatment would not have been covered by the insurer in place at the actual time of treatment so even though we changed insurers retroactively we would still not be responsible'. Defendant also appends a 'not medically approved / necessary' statement. **The truth, however, is that *all* the positions staked out by Defendant are moot. Defendant's denials are flawed as they all ignore the very facts coverage was approved and coverage was actually provided in full for prior treatments in prior months (and that this coverage would have reasonably extended if it were not for Defendant's own decision to retroactively change carriers).** These facts have been repeatedly communicated and explained to Defendant, yet a denial that takes into account the facts – that treatment was both approved and covered at the actual time of treatment – has yet to be provided.

8. It is also relevant to note that, aside from notification, no plan materials have ever been provided. This is despite clear need for such documents – I, in fact, never received *anything* to begin with. Requests to obtain such documents date as far back as 2002. This is relevant with respect to the appeals process given the very fact documents that would have spelled out such events as the appeals process were never provided by Defendant. Defendant can not thereby use as a basis for argument that CHEWIE did not follow the process when, in fact, Defendant never took steps to notify CHEWIE of *anything* to begin with.

9. It is asserted that any reasonable person would conclude that CHEWIE has availed himself of all reasonable avenues of appeal to resolve the matter.

10. It is also asserted that any reasonable person would conclude that CHEWIE has made every effort to initiate and engage contact regarding this matter and has volunteered a wealth of both time and information in order to resolve the matter in a straightforward and amicable fashion.

11. 300 hours of well-documented effort have now been expended (wasted) in an effort to try and resolve a problem Defendant even admits they themselves created. A summary of much (but not all) of CHEWIE'S effort is outlined below. Suffice to say, a *complete* account of all actions taken to date to resolve this matter will certainly be made available as needed, but CHEWIE likes trees and does not seek to consume the extraordinary amount of added paper that would be required to provide a thorough account. Below is a summary of the timeline of actions and efforts taken to date by CHEWIE, which are summarized in an effort to illuminate both the extraordinary amount of time wasted to date and the clear gross misconduct Defendant has exhibited throughout this process.

12. July 2002 (early): Started additional treatment in effort to treat very serious illness that began in March 2002. Doctor was considered an 'in network' physician and was explicitly approved by HealthNet (original insurer) to deliver on-going treatment. Specific date of treatment was July 11, 2002.

13. July 2002 (late): Continued treatment per treatment plan put forth by Doctor and approved by HealthNet. Specific date of treatment was July 30, 2002.

14. August / September 2002 (or shortly after): Doctor's office was reimbursed for 100% of the cost of previous treatments. Coverage was pegged at 100% as out-of-pocket co-pays, et cetera had been reached due to cost of treatment incurred in earlier battles with illness. On or about the date of September 17, 2002, Doctor's office was reimbursed 100% for the July 30, 2002 treatment. The exact date of reimbursement for the July 11, 2002 treatment in unknown at this time, but it is know with certainty that reimbursement occurred in a timely fashion.

15. August 2002: Called HealthNet and confirmed plan termination date of October 2002, i.e. that my plan did in fact continue throughout September 2002 as long as I paid the expected premium. FYI, this is only one of several times where I confirmed my plan continued through the end of September 2002.

16. August 2002 (late): Paid September 2002 premium to HealthNet in a timely manner. This was done in the same manner as it had been done for many months prior without incident.

17. September 2002 (early): Check for September 2002 premium cleared, i.e. funds were transferred to HealthNet.

18. September 2002 (early): Received continuing treatment per treatment plan put forth by Doctor and approved by HealthNet. Specifically, treatment occurred on September 3, 2002.

19. September 2002 (early to mid): Called HealthNet once again and confirmed, among other things, that everything was Ok, i.e. that coverage was in place, that benefits were in place, et cetera. No

indications of any problems of any kind were evident. In fact, everything was just as it should be. In retrospect, this fact is particularly important as it was true at the time that everything was Ok. It was not until a much later date that past benefits were affected by Defendant's own decision to conduct a retroactive carrier change.

20. September 2002 (mid): Contacted HealthNet and requested a Letter of Credible Coverage as evidence of insurance history. Was assured a Letter of Credible Coverage would be sent.

21. At this point, the summary begins. Throughout late 2002, specifically the timeframe of September 2002 through early 2003, an inordinate number of attempts were made to acquire from HealthNet – the original insurer – a Letter of Credible Coverage. HealthNet simply failed to provide such no matter how many times they were contacted. Two points are important to note. First, HealthNet simply failed to produce a Letter of Credible Coverage. Second, it was *only* through this dialogue with HealthNet that CHEWIE discovered he had suddenly *lost* past benefits. It just 'happened' that in one call sometime in later 2002 CHEWIE'S termination date all of a sudden switched from September 30, 2002 to September 1, 2002. This was at first discounted as an error in the system and focus was reapplied to obtaining a Letter of Credible Coverage. Logic would seem to dictate that given CHEWIE'S payment of the premium that, naturally, he would receive benefits that had been explicitly confirmed in prior conversations. Obtaining a Letter of Credible Coverage was, therefore, the pressing item at the time and so attention was refocused on the Letter of Credible Coverage issue.

22. Note that there is no mention of *any* contact from Defendant. The fact of the matter is Defendant failed to notify CHEWIE of the retroactive carrier change and, by virtue of that fact, ignored their

fiduciary responsibility to properly administer their health insurance plan. Defendant has admitted their guilt to at least the Department of Labor (and perhaps others) but not to CHEWIE. The fact is also particularly important as the failure to notify CHEWIE of the carrier change only served to confuse and confound CHEWIE'S efforts to obtain a Letter of Credible Coverage. CHEWIE was at this time operating entirely in the dark directly due to Defendant's own failures.

23. No less than 20 substantive calls and other correspondence either engaged or were directed at HealthNet throughout this period. While a Letter of Credible Coverage was ultimately obtained, eventual compliance did not involve Defendant nor did any of this exchange prompt Defendant to act accordingly. (This would have been the point where Defendant should have admitted their guilt and worked to address the impact their retroactive carrier change had on past benefits.)

24. At some point in late 2002 and extending into 2003, CHEWIE engaged the HMO Help Center, a quasi-governmental agency in the State of California. Keep in mind that CHEWIE still believed all that was wrong was HealthNet's failure to generate a Letter of Credible Coverage, which was now presenting barriers to continued treatment of CHEWIE'S illness. The HMO Help Center was engaged to 'pressure' HealthNet into compliance. Also, efforts were initiated at this time to better understand CHEWIE'S rights under the law and to preliminarily investigate the possibility of involving a lawyer. It was uncovered through this process and entirely through CHEWIE'S own efforts that benefits actually *had* been affected by a now-apparent retroactive carrier change conducted by the Defendant.

25. At this time, namely late 2002, contact is initiated with Defendant. CHEWIE offers 'initiated' as the descriptive term as in most cases no response was received whatsoever. In all cases, there

was absolutely no substantive response. (The only response was an e-mail cc: that forwarded the issue within Defendant's organization.)

26. An accounting of contact directed to Defendant and the relevant outcome is presented as follows. An e-mail was sent to the attention of Defendant's President & CEO on December 18, 2002 – **This e-mail was ignored**. This is particularly relevant as another e-mail on an entirely different topic sent on the same day was replied to immediately. Another e-mail was sent to the attention of Defendant's President & CEO on December 29, 2002 – **This e-mail was forwarded and then ignored**. Two e-mails were sent to Defendant on January 3, 2003 to both establish contact with the apparent contact and as a good-faith effort to help move the process along – **These e-mails were ignored**. It is also asserted that there was another attempt to contact Defendant prior to the above but that any documented e-mail history was destroyed when CHEWIE'S computer hard drive crashed in late 2002. This brings the number to five – five efforts to engage Defendant, all of which are ignored.

27. The HMO Help Center is consulted on the above and asked for assistance in also resolving the matter of past benefits negatively impacted by Defendant's retroactive carrier change. CHEWIE is told in no uncertain terms that the scope of the HMO Help Center is *only* to address issues that pertain to the misconduct of insurers. In other words, *any* employer issue is outside their scope and range of responsibility. No less than 15 substantive calls and other correspondence engaged the HMO Help Center throughout this period, and substantial contact with the HMO Help Center lapses sometime in early 2003 due to the following point.

28. It is now early 2003, and the only bright spot appears in this entire process. Through engagement with the HMO Help Center, Defendant's health insurance broker, ABD Insurance and Financial Services ("ABD"), is brought into the mix. ABD then works to do the following: obtain a Letter of Credible Coverage from HealthNet and enroll CHEWIE with Blue Shield retroactively. This would all sound great, especially as ABD was informed in detail of the impact Defendant's own retroactive carrier change had on CHEWIE'S past benefits and seemed to understand the gravity of the situation. At this point, CHEWIE was lead to believe all would be taken care of and that it was simply a matter of time to let everything work through the system. There was no reason for CHEWIE to believe otherwise.

29. Unfortunately, this 'bright spot' turns out to utterly fail to address the underlying problem. Every effort was made on CHEWIE'S part to help move the process along, i.e. complete paperwork, et cetera, but there was *no* reciprocal effort invested in fulfilling coverage for treatment that was approved and covered at the actual time of treatment. This becomes apparent in mid-2003 when CHEWIE is informed of Blue Shield's denial of coverage. ABD is informed of this event and is told the matter needs to be resolved post haste. CHEWIE has by this time invested an inordinate amount of time and has done all that was requested. While Blue Shield may have the right to deny coverage (as they never had the opportunity to approve coverage prior to the actual time of treatment), it is Defendant's responsibility to acknowledge the impact of their retroactive carrier change and fulfill their fiduciary responsibility to restore past benefits.

30. Throughout the phase of contact with ABD, more than a handful of one-on-one conversations take place and quite a number of e-mails are exchanged. All this ultimately leads back to square one, leaving CHEWIE without benefits he paid for and in a growingly dire situation with respect

to the impact this matter may have on continuing treatment.

31. At this time, CHEWIE takes a break. He has informed ABD of Defendant's responsibility and that it is incumbent upon Defendant to restore benefits that were only affected by their decision to retroactively change carriers. Yet – despite the obvious facts – CHEWIE is left holding the bill for treatment and has now wasted approximately 100 hours of his personal time trying to resolve a matter that is clear to anyone who understands benefits administration. The matter should never have gotten this far, CHEWIE knows that, but CHEWIE needs to take a break and focus on work / health. Note, this does *not* mean CHEWIE had absolved Defendant of responsibility – CHEWIE clearly articulated and repeated the facts at hand. It was simply obvious it would take yet another round of even much more effort to obtain justice for what now clearly constituted a major offense dating back to September 2002.

32. It should be noted that in proximity to this timeframe Blue Shield's denial of coverage is appealed and then subsequently denied. Blue Shield's position persists to this day despite future efforts to make additional appeals.

33. In early October 2003, Defendant actually contacts CHEWIE directly. In retrospect, it's obvious why they did so – Defendant was in the process of terminating their relationship with Blue Shield effective November 1, 2003 and wanted to 'clear the books' of their responsibility. At this point, it would seem Defendant seals their fate – Instead of admitting responsibility, Defendant engages in a plan to evade responsibility. Defendant does this in two ways. First, Defendant first asks for information and then pushes CHEWIE to appeal with Blue Shield despite having been told Blue Shield already considers the matter appealed and subsequently denied. Second, Defendant abuses

CHEWIE'S good-faith effort to provide documentation anyway by simply adopting Blue Shield's denial as their own justification. This is done without admitting Defendant caused the problem to begin with while claiming to have conducted an investigation of the matter. (The investigation is covered in detail in another Amendment to the original Complaint.)

34. It bears repeating Defendant was both 1) advised that coverage had already been appealed and denied by Blue Shield and 2) provided with a thorough explanation of the situation both by phone and in subsequent written communication.

35. It is also noteworthy that, of the documentation CHEWIE provided to Defendant that was then returned in raw form, there is a little, yellow highlight on the section referring to Blue Shield's denial. No other notes or materials were either made or provided. It would appear Defendant 'focused like a laser beam' on the one item they themselves could use as an excuse for denying benefits at the expense of all else.

36. Another important point is that Defendant – throughout the timeframe of October 2003 onward – claims to have investigated the matter. The particular point of Defendant's apparent investigation is elaborated on in a separate Amendment, but suffice to say here, it is now clear Defendant never conducted what would be considered an objective or valid investigation. In fact, it is asserted that this investigation was fraudulent in nature and premeditatedly executed in an attempt to establish any possible rationale for denial of coverage. Furthermore, no details of Defendant's investigation have ever been provided, and it is noted that the supposed investigation took less than 48 hours to complete. It's reasonably assumed that any proper investigation of a matter such as this could not be completed in this timeframe, especially when Defendant was only provided with a partial set of

documentation 48 hours prior.

37. At this point, CHEWIE contacts the Department of Labor as it's clear an even greater effort is needed to obtain justice. This occurs in late 2003 and extends into early 2004. The Department of Labor's Employee Benefits Security Administration ("EBSA") initiates contact with Defendant and attempts in good-faith to remedy the situation. While the details of the exchange between the EBSA and Defendant are presented in a separate Amendment to the original Complaint, it is now clear that Defendant acknowledged responsibility for having caused the problem to begin with yet continued to refuse to make efforts to remedy the situation. It is also noted that Defendant was advised by the EBSA of their core responsibility to conduct a fair review, i.e. one that would not be considered arbitrary, and that they could be held accountable under ERISA for not fulfilling that and other requirements. These factors were never relayed to CHEWIE in real-time and only recently came to CHEWIE'S attention via a documents request of the EBSA. To date, no fewer than 10, and more likely 15, calls and communications occur between CHEWIE and the EBSA throughout this timeframe.

38. At this point (late 2003), the matter of securing past benefits that were paid for in a timely manner has cost CHEWIE 200 hours of his own personal time, a growing level of stress and frustration, an impact on his health, and costs and difficulties associated with other health-related factors due to the inordinate amount of attention required to address the matter. It's becoming clear even yet more attention and additional strategies are required to bring about resolution.

39. Yet – even up until this point – Defendant could have resolved the matter by acknowledging their failure (as they had to the EBSA) and simply paying the original cost of treatment going back to

2002. Though both negatively and significantly impacted by the situation, CHEWIE recognizes that precedent would *not* necessarily award CHEWIE either damages or statutory penalties if the matter were resolved at this time. It was not resolved, however, despite the now apparent advice provided to Defendant by the EBSA. Obviously in retrospect, this has now turned into a case of utter and complete bad-faith on the part of Defendant. CHEWIE just did not know that until the current date.

40. In early January 2004, now approaching 18 months since the problem was created, CHEWIE begins a more aggressive campaign to elevate and escalate the matter. CHIEWIE sends a formal DEMAND LETTER to the attention of Defendant's President & CEO (now a different person than before, though the prior President & CEO is still employed by Defendant). In it, CHEWIE lays out *all* the facts. The only response comes much later and from Defendant's lawyer stating that there is no viable claim against Defendant and that CHEWIE'S demands are refused. This is despite the fact, yet still unknown to CHEWIE at that time, that Defendant had *already admitted to the EBSA that they were responsible for having created the problem in the first place.*

41. CHEWIE also engages in what really amounts to a one-way dialogue with Defendant as it is clear at this time that Defendant has disengaged. Letters and e-mails are sent to those involved in the process. Letters are also sent to selected Board Members communicating the seriousness of the issue and that Defendant's behavior is inexcusable. This is communicated from the perspective of someone not only impacted by Defendant's capricious behavior but also as a stockholder with a vested interest.

42. CHEWIE also initiates an extensive effort to gather relevant documentation. Keep in mind, to this date CHEWIE has *only* received a single-page enrollment form. *That's it* despite Defendant being well aware of the fact CHEWIE was never advised of the retroactive carrier change going all the way back to 2002. To date, the most enlightening piece of documentation is that obtained from the EBSA. HealthNet and Blue Shield both refuse on more than one occasion to provide an accounting of the retroactive carrier change. Blue Shield does provide a copy of CHEWIE'S file, but nothing in it sheds light specifically on the retroactive carrier change itself. Both HealthNet and Blue Shield cite confidentiality as their reason to not produce documents. The HMO Help Center – perhaps most disappointing – either lost or never took adequate notes, and their limited response is still pending.

43. CHEWIE'S request to the Defendant of a timeline accounting for the retroactive carrier change and any and all relevant documentation is ignored. The point must be emphasized that this was only yet another request in a long line of requests as well as clear responsibility on the part of Defendant to provide such materials going all the way back to 2002.

44. CHEWIE finally takes it upon himself to thoroughly research his rights under applicable federal statute and to assess every step he has taken to date. CHEWIE concludes he has done all that is required (and much more). CHEWIE then ultimately spends the necessary time to draft and then file a formal Complaint PRO SE with the United States District Court.

45. CHEWIE explicitly testifies that all of the above are true and beyond dispute by Defendant. Any counter by Defendant can not ignore Defendant's admission to the EBSA of their having caused the problem to begin with, Defendant's clear fiduciary responsibility in this matter, and especially

not Defendant's obvious bad-faith and gross misconduct in evading their fiduciary responsibility throughout the 2002-2004 timeframe.

46. It is asserted that CHEWIE has now spent an incredible 300 hours trying to get to the bottom of the situation in an effort to secure benefits that have been capriciously denied. Much of the latest increment has been spent approaching Defendant again and again, gathering documentation, and preparing to take formal civil action.

47. The above is why Defendant must be held accountable to the fullest extent of the law. Not only did Defendant act in bad-faith but, when all the facts are considered in their entirety, a broader picture also becomes clear: Defendant worked to *evade* their responsibility, a responsibility that originated with them to begin with yet they did nothing about throughout the entire timeframe of 2002-2004. It is clear Defendant failed to fulfill its fiduciary responsibilities, of which there are many in this case, and that Defendant has also acted in bad-faith and with gross misconduct and must be held accountable to the fullest extent of the law.

48. CHEWIE hereby also adds an additional violation of guidelines pertaining to the timely generation of a Letter of Credible Coverage. Given Defendant's poor behavior and bad-faith in not resolving this matter, Defendant is also held accountable for the significant delay in CHIEWIE receiving a Letter of Credible Coverage. While requests for a Letter of Credible Coverage were made to the original insurer, it is Defendant's responsibility to see to the proper administration of their plan. Given the retroactive nature of Defendant's carrier change in 2002, it was all the more incumbent upon Defendant to see to the proper transition from one carrier to another. CHEWIE'S efforts to

obtain a Letter of Credible Coverage consumed an inordinate amount of time – 20 calls to and contact with HealthNet and another 15 calls to and contact with the HMO Help Center. A Letter of Credible Coverage was requested as far back as September 2002 in preparation for CHEWIE'S transition to another carrier, yet no Letter of Credible Coverage was delivered until mid-March 2003, in the neighborhood of seven months *after* a Letter of Credible Coverage was requested and should have reasonably been delivered. Defendant is held accountable as it was Defendant's own action in *not* notifying CHEWIE of a carrier change that both confused and confounded CHEWIE'S efforts to obtain a Letter of Credible Coverage to begin with.

### RELIEF

CHEWIE repeats his request that this case be expedited as the facts – once presented – are clear, extensive efforts to amicably resolve this matter have already consumed the past 18 months to no avail, and continued protraction of this matter only goes to jeopardize important and necessary continuing care.

CHEWIE also offers that judgment on this case can be expedited as the core of this case – denial of benefits that were actually in place at the time of treatment as well as all the follow-on penalties related to notification, et cetera – is solely a matter of enforcement of established statute. Simply put, Defendant has 'dug its own grave' by 1) admittedly having caused the problem to begin with and 2) knowingly denying benefits that were *identical to benefits received in prior months*. There is no need for discovery – *all* that's needed is for the Court to hear the facts and fairly administer justice.

CHEWIE adds to the relief already sought in the original Complaint an amount of $23,100 as recently calculated on March 28, 2004 and as determined by the following:

$23,100 in mandatory penalties associated with non-compliance of clearly established ERISA and COBRA guidelines requiring the timely generation of a Letter of Credible Coverage. A Letter of Credible Coverage was not provided in a timely manner despite CHEWIE'S protracted efforts to obtain one. Any efforts were further confused and confounded by Defendant's failure to offer proper notification of the related carrier change, thereby directly hampering CHEWIE'S ability to both understand the situation and work to resolve the Letter of Credible Coverage issue. A good-faith reduction in this figure is not offered given the now clear bad-faith exhibited by Defendant. The above figure is computed using statutory penalties outlined in ERISA – if identified correctly – which requires a plan administrator to provide a Letter of Credible Coverage or face statutory liability in the amount up to $110 per day over the period of such failure. If the above should turn out to not be the right penalties to assess, CHEWIE yields to the Court's opinion on the proper statute upon which to rely for appropriate statutory penalties.

Signature _____

Name       MARK FELLENZ, PRO SE

Address    95 LANGLEY ROAD #1
           NEWTON CENTER, MA  02459

Telephone  857-205-5742 (cellular)