# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Mark N. Fellenz
PLAINTIFF

V.

Enkata Technologies
DEFENDANT

CIVAL ACTION

NO. 04•10563 PBS

# COMPLAINT

## PARTIES

1. Plaintiff is a resident of the Commonwealth of Massachusetts and resides at 95 Langley Road #1,

   Newton Center, MA 02459.


2. Defendant is a corporation registered with the California Secretary of State and headquartered as

   stated on its own website at 2121 South El Camino Real, Suite 1200, San Mateo, CA 94403.


## JURISDICTION

3. Enkata Technologies ("Defendant") has utterly and comprehensively failed in its fiduciary duties /

   responsibilities in its role as Plan Administrator to honor health insurance coverage Mark Fellenz

   ("Plaintiff") both 1) paid for in good-faith and 2) paid for with every reasonable expectation that

   Plaintiff would continue to receive coverage for medial treatment of a serious and ongoing illness.

   Defendant's behavior since late 2002 is in defiance of numerous ERISA and COBRA guidelines

   as defined in Federal Statute over which United States District Court has complete jurisdiction.

4.  Furthermore, Federal Statute specifically cites a lawsuit pertaining to the above may be filed in any of the following locations: the District of Defendant, the District of Plaintiff, or the District of the related offense. Federal Statute also cites that the party bringing action has sole discretion in selecting the location. Plaintiff selects the United States District Court, District of Massachusetts, Boston Courthouse, the District of Plaintiff and District of the related offense.

5.  Specifically – and to the very best of Plaintiff's effort (if not skill) to properly identify the specific and applicable Federal Statute – Federal Statute involved are but are not limited to the following:

   ➢ 29 U.S.C. § 1161 (or related statute) making clear that an employer must supply proper and timely notification to participants;

   ➢ 29 U.S.C. § 1104(a)(1)(B) specifying an employer must administer their plan with the required "*care, skill, prudence, and diligence*";

   ➢ 29 U.S.C. (exact statute not specified) outlining an employer's clear fiduciary responsibility with respect to plan administration;

   ➢ 29 U.S.C. § 1024(b)(4) (or related statute) pertaining to a plan administrator's obligation to provide copies of plan materials to a participant;

   ➢ Any other statue or applicable law implied by this case that are reasonably identifiable in the matter presented below and covered under the jurisdiction of the United States District Court. Given the Pro Se nature of this filing, Plaintiff asks for reasonable assistance in identifying additional statute as are obviously implied by or reasonably applicable and consistent with this Complaint; and

   ➢ Other statute or applicable law not mentioned above but are specifically referenced in this Complaint.

The above apply to various ERISA, COBRA, and other Law which are Federal Statute by their very nature and, by virtue, all within the purview of the United States District Court.

6.  Additionally cited, though no specific statute is provided, is any U.S.C. applicable to a breach in the contract as implicitly entered into by Plaintiff both in good-faith and with reasonable expectation of receiving continued benefits with respect to the health insurance contract between Defendant and HealthNet, the original insurer, which was inexplicably and retroactively cancelled in direct conflict with the terms of the contract itself. Given the Pro Se nature of this filing, Plaintiff asks for leniency in not citing specific, applicable statute to the above circumstance.

## BACKGROUND

7.  This case centers on a simple fact – that Defendant decided voluntarily and of its own accord to conduct a *retroactive* carrier change. The retroactive carrier change had an immensely *negative* impact on Plaintiff's *past* benefits by retroactively 'taking away' benefits that were in place at the actual time of treatment. This is despite the simple fact benefits were paid for in a timely fashion, were paid for in good-faith of continued coverage, and which clearly demonstrated a history of coverage for the *exact* treatment Defendant has since denied. Defendant was in complete control (as well as holds responsibility for) the situation as it was Defendant's – and only Defendant's – action to interfere with *past* benefits that prevented Plaintiff from ultimately receiving the benefits he had paid for and had every right to expect. This case stems from a problem entirely caused by Defendant and not anything Plaintiff did (or failed to do). In such cases, responsibility clearly falls to the Defendant to cover *all* adverse impacts on past benefits incurred by such a change as well as to suffer the punitive and monetary damages specifically established by Federal Statute for its

numerous violations of applicable Law (see #8 below).

8. <u>In failing in the above respect, Defendant has since proceeded to both inflame / greatly exacerbate the breadth and depth of Defendant's offenses</u> by, among others, 1) failing to notify Plaintiff of the carrier change – none was ever provided, 2) failing to properly and responsibly fulfill the duties of plan administrator in properly administering its plan – of which there are many examples of total indifference (at best) and poor / inexcusable behavior (at worst), 3) conducting what's interpreted as a fraudulent 'medical review' of the situation – benefits were denied as 'not medically approved by the FDA' when the clear fact was a demonstrated history of coverage existed, i.e. treatment was consistent with and <u>identical to</u> treatment that was both approved and covered by the carrier of record in prior months, and 4) failing to produce copies of related documentation – of which there has only been steadfast refusal to produce some of the most basic of information. When given the choice to do not just 'the right thing' or even what Defendant was obligated to do under the Law, Defendant choose to ignore, then evade and obstruct, and then finally perpetrate what can only be interpreted by any objective person as a fraud intent on avoiding responsibility at all costs. The above by no means completely enumerate the gross misconduct of Defendant, but it does go to establish some basic facts related to how and why this case has ultimately made its way to the United States District Court and why Defendant must now be held <u>fully accountable</u> for its egregious behavior. Each and every aspect of the above (along with additional offenses outlined in this filing) will be completely supported by incontrovertible evidence.

9. To introduce just one instance of Defendant's utter bad-faith (if not perhaps deceit), the following was articulated by Mr. Randy Heppner, Defendant's Controller and the person of authority in

*direct* control of Defendant's decision to deny benefits.

> "*If HealthNet* [original insurer] *would have covered the cost of those services even though Blue Shield* [retroactive insurer] *declined to cover them we would be responsible and would cover them.*" – Enkata Technologies e-mail to Mark Fellenz dated December 5, 2003

10. Clearly, a *quid pro quo* standard is erected by Defendant, that being the following: if HealthNet had covered treatment in prior months, then Defendant would be responsible if Blue Shield were to deny coverage. Unfortunately, Defendant has since backed away from and ignored requests for clarification of its own statement once the fact was brought to Defendant's attention that <u>*identical*</u> <u>treatment had in fact been covered and paid for by HealthNet in prior months</u> (a fact Defendant had been advised of verbally but that may not have been recognized at the time Defendant offered the above statement). In any event, the above statement coupled with Defendant's persistent refusal to honor benefits that conform to Defendant's own *quid pro quo* criteria go to establish just one instance of Defendant's clear intent to evade and / or obstruct its fiduciary responsibility. Defendant, Defendant's agents, and Defendant's lawyers have been advised both verbally and in writing of the fact HealthNet had both approved and covered identical treatment in prior months no fewer than **fifty** times.

11. To date, absolutely no formal, written explanation of denial of benefits has *ever* been received by Plaintiff that comport with the fact HealthNet had both approved and covered identical treatment in prior months or that clarifies / rebuts the above statement offered in December 2003. Only the above statement (and a few derivatives that similarly ignore and / or distort historical fact) have been offered despite many quite specific requests for a "*detailed explanation signed-off by both . .*

. [Defendant and Defendant's lawyers] . . . *making clear the basis for denial of benefits*". This – not honoring benefits conforming to Defendant's <u>exact</u> *quid pro quo* statement, nor offering an explanation of why benefits have been denied – is truly appalling behavior by any standard.

12. The above instance is – while glaring – but one example of Defendant's inexcusable behavior and clear choice to evade and obstruct fulfillment of its fiduciary responsibility. Other, similar events and instances are presented throughout this filing (and will be supported by appropriate evidence during trial).

## HISTROY OF EVENTS AND CIRCUMSTANCES (2002 TO PRESENT)

NOTE: For a concise summary of Defendant's numerous offenses, please refer to the section titled "**ENMUERATION OF OFFENSES**" below (#71).

13. As a former employee of Defendant, Plaintiff elected continued health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985, which was fortunate as around March 2002 Plaintiff became seriously ill and required extensive medical treatment.

14. Throughout the period of March 2002 through September 2002, premiums were paid in a timely manner, and health insurance coverage was generally fulfilled by HealthNet, the carrier of record, for the period of March 2002 through August 2002. A short description of relevant events during this time period are presented in the following few paragraphs.

15. July 2002 (early): Started additional treatment in effort to treat very serious illness that surfaced in March 2002. Doctor was considered 'in network' and was approved by HealthNet, the original insurer, to deliver on-going treatment. Specific date of treatment was July 11, 2002.

16. July 2002 (late):  Continued treatment per treatment plan put forth by Doctor and approved by HealthNet.  Specific date of treatment was July 30, 2002.

17. August / September 2002:  Doctor's office was reimbursed for the cost of previous treatments. Coverage was pegged at 100% as out-of-pocket co-pays, et cetera had been reached due to the enormous cost of treatment incurred throughout the course of treating Plaintiff's illness.  While the exact date of reimbursement for the July 11, 2002 treatment is unknown at this time, it is known with certainty that reimbursement occurred in a timely fashion.  On or about the date of September 17, 2002, Doctor's office was reimbursed for the July 30, 2002 treatment.

18. August 2002:  Plaintiff called HealthNet and confirmed coverage.  FYI, this is only one of several times where Plaintiff confirmed the above.

19. August 2002 (late):  Paid September 2002 premium to HealthNet in a timely manner.  This was done in the same manner as had been done for many months prior without incident.

20. September 2002 (early):  Check for September 2002 premium cleared, i.e. funds were transferred to HealthNet.

21. September 2002 (early):  Received continuing treatment per treatment plan put forth by Doctor and approved by HealthNet.  This treatment was *identical to* treatment received in prior months. Specifically, treatment occurred on September 3, 2002.

22. September 2002 (mid to late): Plaintiff called HealthNet once again and confirmed coverage, i.e. that coverage was in place, that benefits were in place, et cetera. No indications of any problems of any kind were evident. In fact, Plaintiff was told everything was Ok and that all was in order. In retrospect, this is particularly important (and not so surprising) as it was true – everything was Ok. It was not until much later that past benefits suddenly disappeared by virtue of Defendant's own interference with Plaintiff's health insurance causing Plaintiff's <u>past</u> benefits to be 'taken away' as a direct result of Defendant's retroactive carrier change.

23. At this point this is when everything proceeds straight downhill (and continues to do so through to the current day and beyond). What can be identified with certainty and beyond reproach over this intervening period is presented as follows.

24. First of all, there's no mention in the above account of Defendant (or HealthNet for that matter) having notified Plaintiff of the retroactive cancellation of the HealthNet plan despite Defendant being in possession of Plaintiff's contact information (both physical and e-mail address). It just 'happened' that over the course of a series of calls with HealthNet covering October 2002 through November 2002 that Plaintiff's termination date was suddenly changed and backdated – <u>Plaintiff had been left to discover on his own that his health insurance had been retroactively cancelled</u>. This is despite the extraordinary clarity with which it is a core responsibility of Defendant (and perhaps HealthNet) to proactively notify Plaintiff of any changes. Admittedly, the change was a surprise to Plaintiff as Plaintiff had clearly paid his premium in a timely manner and had even gone to the lengths in prior weeks of specifically confirming coverage directly with HealthNet. This obviously made no sense and so the sudden adverse change in termination date was at first simply discounted as an error in the system.

25. Plaintiff's lack of awareness was exacerbated by the clear failure of relevant parties to produce a Letter of Credible Coverage in a timely fashion, which if done appropriately and in accord with established HIPAA guidelines, would have brought into sharp focus the matter of the retroactive carrier change itself. Plaintiff was instead left 'in the dark' regarding the situation and without the proactive support and / or involvement of Defendant as proscribed and demanded under well-established and well-adjudicated Law.

26. As Plaintiff was coming to realize that there actually was a real problem (and not just an error in the system), Plaintiff followed two courses of action: 1) engage the services of the HMO Help Center, a quasi-governmental agency in the State of California, and 2) directly engage Defendant on the matter. Through interaction and assistance of the HMO Help Center, it was determined that there *was* a retroactive cancellation – details unspecified – of the health insurance plan with HealthNet at the request of Defendant and that the retroactive cancellation was the cause for the sudden and adverse change in termination date. (Note, this is also roughly the same point in time when the Doctor's office first notified Plaintiff of a suddenly unexpected denial of coverage from HealthNet.) This is the first point in time where Plaintiff is fully aware of the fact his health insurance – insurance Plaintiff had both paid for and was actively depending upon – had been retroactively cancelled.

27. In regard to direct engagement with Defendant on the matter, Plaintiff initiated contact with Defendant in late 2002. Plaintiff offers 'initiated' as the descriptive term as in most cases no response was received whatsoever. In all cases, there was absolutely no substantive response.

(The only response was an e-mail cc: that forwarded the issue within Defendant's organization and provided no useful and / or helpful information.)

28. An accounting of contact directed to Defendant and relevant outcomes is presented as follows. An e-mail was sent to the attention of Defendant's President & CEO on December 18, 2002 – **This e-mail was ignored**. This is particularly relevant as another e-mail on an entirely different topic sent on the same day and to the same person was replied to immediately. Another e-mail was sent to the attention of Defendant's President & CEO on December 29, 2002 – **This e-mail was forwarded within Defendant's organization and then ignored**. Two e-mails were sent to Defendant on January 3, 2003 to both establish contact with the apparent contact and as a good-faith effort by Plaintiff to help move the process along – **These e-mails were both ignored**. It is also asserted that there was another attempt to contact Defendant prior to the above but that any documented e-mail history was destroyed when Plaintiff's computer hard drive crashed in late 2002. This brings the number to five – five efforts to engage Defendant, all of which are ignored.

29. It's at this point Defendant begins to break with its responsibility to administer Defendant's health insurance plan with "*the care, skill, prudence, and diligence*" expected under the Law. This also happens to be the point where Defendant ignores Defendant's clear fiduciary responsibility to the health insurance plan. Even if Defendant's failure to notify Plaintiff of the retroactive cancellation and subsequent retroactive enrollment had been purely honest mistakes / oversights, it was now readily clear that Plaintiff had been missed egregiously. Defendant received multiple and direct contacts from Plaintiff claiming his benefits had been retroactively cancelled when even a cursory review of the overall situation by Defendant would have raised numerous red flags for *immediate* attention / feedback with Plaintiff. It is furthermore beyond reproach that it was the Defendant's

actions – and Defendant's actions only – that 'took away' Plaintiff's past benefits and, thereby, it was the clear fiduciary responsibility of Defendant to restore / 'make whole' the very situation Defendant had adversely affected through its own actions, regardless of intent or circumstance.

30. It is now early 2003 and via the assistance of the HMO Help Center, Defendant's health insurance broker, ABD Insurance and Financial Services ("ABD"), is brought into the mix. ABD works to do the following: obtain a Letter of Credible Coverage from HealthNet and retroactively enroll Plaintiff with Blue Shield. It is important to note that this conversation is the *first* time Plaintiff is advised that Blue Shield was retroactively contracted to pick-up from where HealthNet had been retroactively cancelled. It's now early 2003, and just as it was Defendant's responsibility to notify Plaintiff of the retroactive cancellation of the health insurance plan with HealthNet, it is clear that Defendant has also abused its responsibility to advise Plaintiff of Plaintiff's rights to elect COBRA coverage under the new plan with Blue Shield. 'Abused' is an appropriately descriptive term as Plaintiff had, after all, been repeatedly contacting Defendant throughout December 2002 and that – given the now apparent situation – Plaintiff's efforts should have triggered Defendant to act in 2002. Failure to act and directly engage Plaintiff and instead to continue to allow Plaintiff to learn important information through his own efforts (and not from Defendant directly) is a clear abuse of Defendant's responsibilities.

31. Throughout the process of retroactive enrollment with Blue Shield, ADB is advised of the entire situation to date and that benefits must be restored. ABD assures Plaintiff everything just needs to work its way through the system and that everything will eventually be taken care of. It's clear throughout this process ADB is in regular contact with Defendant – not that Defendant is actually helping in any way.

32. However, it quickly becomes apparent in mid-2003 that there actually was *no* reciprocal effort applied to actually restoring benefits. This is realized when Plaintiff informs ABD of Blue Shield's denial of benefits. As ABD is informed of this event, ABD is instructed the matter must be resolved post haste and that it simply falls to Defendant as the ultimate party of responsibility to restore past benefits – It was, after all, Defendant's actions that caused Plaintiff's benefits to be lost in the first place. Plaintiff very clearly directs ABD to advise Defendant of this matter and see to its resolution. Simply put, nothing happens, and this is where Defendant again ignores – now for at least the second time – Defendant's clear fiduciary responsibility to restore / 'make whole' the past benefits Defendant had adversely affected through its own actions.

33. It should be noted that in proximity to this timeframe Blue Shield's denial of coverage is appealed by Plaintiff, and the appeal is subsequently denied. Blue Shield's position persists to this day despite future efforts to make additional appeals, which are described in greater detail later in this filing (#36 #37).

34. In early October 2003 – now nearly a year after Plaintiff initially initiated contact with Defendant – Defendant actually contacts Plaintiff directly *for the first time*. In retrospect, it's obvious why Defendant did so – Defendant was in the process of terminating its relationship with Blue Shield effective November 1, 2003 and wanted to 'clear the books' of any financial obligations. (Why this is clear will soon be apparent.) At this point it would seem Defendant seals its fate – Instead of admitting responsibility, Defendant engages in a plan to evade responsibility. Defendant does this in two ways. First, Defendant first asks for information and then pushes Plaintiff to appeal with Blue Shield despite having been told Blue Shield already considers the matter appealed and

subsequently denied. Second, Defendant abuses Plaintiff's good-faith gesture of volunteering

documentation anyway by simply 'lifting' / adopting Blue Shield's denial as its own justification.

This is done without admitting Defendant caused the problem to begin with while also claiming

shortly thereafter to have fully investigated the matter.


35. It bears repeating Defendant was both 1) advised that coverage had already been appealed and

    denied by Blue Shield and 2) provided with a thorough explanation of the situation both by phone

    and in subsequent written communication.


36. As an important sidenote, ERISA guidelines clearly state appeals must be exhausted before taking

    legal action. This serves as Plaintiff's testament to the fact that direct appeals to HealthNet, Blue

    Shield, Defendant's agents, Defendant's lawyers, and Defendant directly – both reasonable and

    otherwise – have long been exhausted. Appeals were made to Blue Shield, in fact, no less than

    three times, and Defendant has been advised of that very simple and straightforward fact going

    back to October 2003. Innumerable appeals have been lodged with Defendant that Defendant has

    either ignored or responded to with denials of coverage that defy both logic and clear / well-

    substantiated facts.


37. A full accounting of appeals with Blue Shield are the following: Mid-2003 appeal appears to have

    been automatically triggered by the conditions related to this particular case – appeal denied on

    July 3, 2003; later in 2003 appeal was made via phone despite being told appeal had already been

    made and had already been denied – appeal denied; later in 2003 additional appeal was made in

    writing to make absolutely certain there was no question all appeals had been exhausted – appeal

    denied again on November 18, 2003. Defendant was apprised in October 2003 that appeals had

already been denied (despite the fact the third was forthcoming), and Plaintiff was later advised by the HMO Help Center's IMR Unit that no further appeals were required prior to Plaintiff taking legal action. Throughout late 2003 and roughly the first half of 2004 Plaintiff regularly advised Defendant of Defendant's ultimate fiduciary responsibility to honor past benefits to no avail.

38. It is especially noteworthy that – of the documentation Plaintiff provided to Defendant that was then later returned in raw form – there is a yellow highlight across the exact section of a copy of Blue Shield's denial letter (just one of the documents provided to Defendant by Plaintiff) *exactly* highlighting Blue Shield's rationale for denial. No other notes or highlights are present anywhere else on any of the documents made available to Defendant. It is now clear from reviewing this in physical form that Defendant 'focused like a laser beam' on the one item Defendant could itself use as an excuse for denying benefits at the expense of all else. This factor is especially relevant given that the timeframe between 1) documentation provided to Defendant and 2) benefits denied by Defendant was so brief.

39. Another important point is that Defendant – throughout the timeframe of October 2003 onward and up until only recently – claimed to have fully investigated the matter. Suffice to say for the reasons presented below, it is now clear Defendant never conducted what would be considered an objective or valid investigation. In fact, it is asserted this investigation was fraudulent in nature and premeditatedly executed in an attempt to establish any possible rationale for denial of benefits, not to establish the readily available facts and circumstances involved. Documentation was not gathered from important sources. No HIPAA authorization was requested in order to investigate the matter. Furthermore, no details of Defendant's investigation have ever been provided despite Plaintiff's requests for such information, and it is noted that the supposed investigation took less

than 48 hours to complete – That's a truly objective measurement of the time from which Plaintiff provided Defendant with documentation to which Defendant communicated its denial to Plaintiff – and it's reasonable to assume that any proper investigation of a matter such as this could not be completed in this timeframe.

40. Furthermore, while Defendant claimed to have investigated the matter in arriving at its decision to deny coverage, a very serious question is raised as *any* appeal to Defendant would necessitate what is generally termed a 'medical review' of the matter, especially given the 'not medically approved / necessary' basis for denial.  A 'medical review', by definition, is generally described as an objective process by which the matter is thoroughly investigated by personnel with no vested / conflicting interests.  Defendant made no direct contact with either Plaintiff or the Doctor who delivered treatment in an effort to gather information in order to conduct a 'medical review'.  If medical information was gathered, it was gathered without the input of two critically important sources.  This alone throws into question Defendant's actions to fully investigate the matter by not having collected all information to begin with before arriving at a decision to deny benefits.  It also raises further questions of how Defendant might have come to acquire medical information in order to arrive at its decision to deny benefits (or face having to admit Defendant never gathered such information in the first place and, thereby, never conducted a thorough investigation to begin with).

41. Further facts also support that Defendant never conducted a proper 'medical review' in order to arrive at a determination to deny coverage.  Every indication is that Defendant's 'medical review' was made by personnel with no medical background and who were responsible for administering the plan, not making judgments of a medical nature.  There is no indication that an independent,

licensed physician (or anyone with a medical background) was involved whatsoever in or with the 'medical review' itself. This alone violates the tenant of employing a 'not medically approved / necessary' denial without having conducted a thorough and objective 'medical review' in order to substantiate any finding(s) on a purely medical basis.

42. In this respect, Plaintiff is left with no option but to consider that Defendant – may have – illegally obtained private medical information without proper consent and / or conducted a fraudulent 'medical review' in order to evade its responsibilities, fiduciary and otherwise.

43. At this point, Plaintiff contacts the Department of Labor as it's clear an even greater effort is needed to obtain justice. This occurs in late 2003 and extends into early 2004. The Department of Labor's Employee Benefits Security Administration ("EBSA") initiates contact with Defendant and attempts in good-faith to remedy the situation. While the details of the exchange between the EBSA and Defendant are only learned much later, it is now clear that Defendant is responsible for having caused the problem to begin with yet inexplicably continued to refuse to make efforts to remedy the situation, and Defendant persists in ignoring its responsibilities despite direct contact from the EBSA.

44. At this point (late 2003), the matter of securing past benefits that were paid for in a timely manner has cost Plaintiff incredible amounts of his own personal time, a growing level of extreme stress and frustration, an impact on his health, and costs / difficulties associated with other health-related factors due to the inordinate amount of attention required to prosecute this case in United States District Court, this all for a problem that's clearly *not* Plaintiff's fault. Furthermore, Plaintiff continues to receive the very same, on-going treatment that begins this case, and the liability for

past medical costs carries on a daily basis to have the potential to disrupt on-going treatment by virtue of the outstanding liability itself. Plaintiff may at any time be reasonably expected to make payment for medical costs, which would be a serious financial hardship given Plaintiff's lack of resources. If that were to happen, Plaintiff would have to make immediate and quite difficult decisions between payment of overdue medical bills verses payment of current and future health insurance premiums Plaintiff actively depends upon. Simply put, there's not enough resources to cover past, present, and future health costs, a fact Plaintiff is fully aware of and stressed by on a daily basis. Plaintiff has finally been able to regain a level of health not known since 2001, and it simply is not acceptable nor reasonable that Plaintiff should allow that to be jeopardized in any way. It is at this point abundantly clear yet even more aggressive strategies are required to bring about resolution.

45. Yet – even up until this point – Defendant could have resolved the matter by acknowledging its failure to Plaintiff and simply paying the original cost of treatment going back to 2002. Though both negatively and significantly impacted by the situation to date, Plaintiff recognizes the fact precedent would not necessarily award Plaintiff either damages or statutory penalties if the matter were resolved at that time. It was not resolved, however, and obviously in retrospect, this has now clearly turned into a case of utter and complete bad-faith on the part of Defendant (though Plaintiff did not learn the full magnitude of such until much later).

46. In early January 2004, now approaching 18 months since problems were initially created by the actions of Defendant, Plaintiff begins a more aggressive campaign to elevate / escalate the matter. Plaintiff sends a formal DEMAND LETTER to the attention of Defendant's President & CEO (now a different person than before, though the prior President & CEO remains employed by

Defendant). In it, Plaintiff lays out all the facts. The only response comes much later and from Defendant's lawyer stating that there is no viable claim against Defendant and that Plaintiff's demands are refused. Defendant is advised by Plaintiff throughout this timeframe that legal action will be taken if the matter is not resolved immediately. Defendant is also advised that should the matter go to Court Defendant will be held accountable for all its violations and egregious behavior to the fullest extent of the Law. This is despite the fact, yet still unknown to Plaintiff at that time, that Defendant had already admitted to the EBSA that they were responsible for having created the problem in the first place (#60).

47. Plaintiff also engages in what really amounts to a one-way dialogue with Defendant as it is clear at this time that Defendant has disengaged. Letters and e-mails are sent to those involved in the process. Letters are also sent to selected Board Members communicating the seriousness of the issue and that Defendant's behavior is inexcusable. This is communicated from the perspective of someone not only impacted by Defendant's capricious behavior but also as a stockholder with a vested interest in Defendant's proper execution of its fiduciary responsibilities and legal duties.

48. Plaintiff also initiates an extensive effort to gather relevant documentation. Keep in mind, <u>to this date Plaintiff has only received a single-page enrollment form</u>. That's it despite Defendant being well aware of the fact Plaintiff was never advised of the retroactive carrier change going all the way back to 2002. HealthNet and Blue Shield both refuse on more than one occasion to provide an accounting of the retroactive carrier change. Blue Shield does provide a copy of Plaintiff's file, but nothing in it sheds light specifically on the retroactive carrier change itself. Both HealthNet and Blue Shield cite confidentiality with respect to Defendant as their reason for not producing documents. Defendant is specifically asked by Plaintiff for a release to which no response is ever

received.  The HMO Help Center – perhaps most disappointing – either lost or never took adequate notes, and their response never arrived.

49. Plaintiff's request to the Defendant of a timeline accounting for the retroactive carrier change and any and all relevant documentation is ignored.  The point must be emphasized that this was only yet another request in a long line of requests as well as clear responsibility on Defendant's part to provide such materials going all the way back to 2002, when Defendant first enacted a carrier change and rode roughshod over Plaintiff's rights.

50. Plaintiff finally takes it upon himself to thoroughly research his rights under applicable Federal Statute and to assess every step he has taken to date.  Plaintiff concludes he has done all that is required (and much more) as well as afforded Defendant more opportunities to correct the problem than warranted or expected, and Plaintiff ultimately spends the necessary time to draft and then file a formal Complaint PRO SE with the United States District Court in early 2004.

51. This is the point at which Plaintiff finally feels he has no other recourse *but* to sue Defendant in United States District Court for the full weight and measure of the case presented herein.  This is especially significant as at this point Defendant has not admitted any amount of responsibility, explained any of its actions or decisions, offered any account of what happened, or produced any useful facts or documentation.  This is consistent with what is later uncovered (see the following below paragraphs) as a clear pattern of inexcusable behavior, misrepresentation of the truth, and even in select cases clear lying employed by Defendant in an effort to try and make this matter 'go away'.  Plaintiff has absolutely no recourse at this point *but* to obtain justice through the United

States District Court.

52. The following paragraphs present what transpires or becomes clear once legal action commences in United States District Court.

53. Defendant and Defendant's lawyers are repeatedly asked why it is that Defendant does not honor its own statement despite the clear *quid pro quo* vis-à-vis the fact clearly and regularly articulated by Plaintiff that *identical* treatment in prior months was covered and paid for by HealthNet. No response or counter to the following is ever received.

> "*If HealthNet* [original insurer] *would have covered the cost of those services even though Blue Shield* [retroactive insurer] *declined to cover them we would be responsible and would cover them.*" – Enkata Technologies e-mail to Mark Fellenz dated December 5, 2003

54. Defendant and Defendant's lawyers are repeatedly asked for an explanation of denial that comports with historical fact – that identical treatment in prior months was covered and paid for by HealthNet. No response is ever received.

55. Defendant and Defendant's lawyers are repeatedly asked to explain the process by which denial was arrived at. No response is ever received.

56. Defendant and Defendant's lawyers are repeatedly asked for a straightforward timeline of events that would explain what happened and when with respect to the carrier change. No response is