ever received.

57. Defendant and Defendant's lawyers are repeatedly asked for documentation related to the matter. Only a select amount of documentation is provided <u>21 months after Defendant was originally and proactively obligated to do so and only after this case had already been filed in United States District Court</u>. These documents remain insufficient with respect to Plaintiff's repeated requests and Defendant's obligations.

58. Defendant and Defendant's lawyers failed to respond to a extraordinarily specific inquiry intent on identifying any potential outstanding request(s) for documentation on the part of Defendant. No response was ever received, and while Defendant has recently asserted there are open requests for documentation, any historical review of this aspect will make abundantly clear that no outstanding requests exist. Instead, it is a fact Defendant had clearly tried to redirect its one and only request for documentation away from Defendant (and toward Blue Shield), and it's also a fact Defendant failed to respond to the above-mentioned specific inquiry directed to Defendant and Defendant's lawyers' attention on this *exact* point.

59. In April 2004 Plaintiff uncovers through his own efforts (and *not* volunteered by Defendant) the following information. All items presented below (except where otherwise noted) are contained in notes generated by the Employee Benefits Security Administration ("EBSA") of the Department of Labor, which are attached and highlighted in raw form.

60. From the From the EBSA's own case notes, Defendant acknowledges or was told the following:

➢ Defendant admitted never having notified Plaintiff of the change in insurance carriers. (Of note is the simple fact Defendant has *never* admitted wrongdoing in any way, shape, or form directly to Plaintiff. Plaintiff only learned of Defendant's admission of guilt after having received the EBSA's response to Plaintiff's document request.)

➢ Defendant acknowledges that they would be required to honor benefits if the particular benefit would have been covered. (It is repeated here and stated elsewhere that Defendant has been *repeatedly* informed treatment was both approved and covered at the actual time of treatment. In fact, *identical* treatment in prior months was approved, covered, and paid in full per the Plan in place at the time, another fact repeatedly explained to Defendant to no avail.)

➢ Defendant was told that an insurance agent's hypothesis or theory is not adequate grounds for denial of benefits and that an arbitrary denial may be a violation of ERISA. (It would appear the Department of Labor took issue with the manner in which Defendant arrived at a decision to deny coverage.)

➢ Defendant admitted <u>again</u> that Plaintiff was not notified of the change in insurance carriers.

➢ Defendant understands that they face *"responsibility for failure to send a timely notification of change of policy"*.

➢ Defendant asserts Plaintiff refused to appeal coverage with the insurer. (This is wrong on two counts. First, it's simply not true – All appeals were made. Second, Defendant was informed by Plaintiff that all appeals were made yet Defendant proceeded to make false statements to the Department of Labor.)

➢ Defendant was told of its fiduciary responsibilities in detail. (What exactly that comment means is unclear in specific detail yet makes clear Defendant was counseled / advised on its responsibilities by the Department of Labor itself.)

➢ Defendant states that Plaintiff refused to provide necessary documentation to evaluate its responsibility. (This is also wrong, but on three counts. First, Defendant had requested such documentation and then specifically advised Plaintiff *not* to send (medical) information but rather to send it to the insurer. Second, information *was* volunteered by Plaintiff directly to Defendant in a good-faith effort to offer credible documentation substantiating the facts at hand. Third, there is no outstanding document request by Defendant – the one and only request Defendant made was fulfilled in good-faith.)

61. Upon reading the case notes, Plaintiff is taken aback by the clarity with which Defendant, on one hand, acknowledges its responsibility yet, on the other, persists in failing / refusing to fulfill its responsibilities. Defendant's behavior can only be characterized as gross misconduct and even a demonstrated pattern of evasion geared toward evading its fiduciary and other responsibilities at all cost, the later of which is quite a troubling possibility to consider. Please see the attached copy of the Department of Labor's case notes for the actual notes taken by the EBSA's representative involved in this matter.

62. Plaintiff also wishes to specifically mention that he had informed Defendant of insurer's denial of appeals on a date that *precedes* the EBSA's case notes on this point. Defendant clearly can not claim Plaintiff refused to appeal when, in fact, he had appealed and had informed Defendant of such. Also contained in the EBSA's case notes is a claim by Defendant that Defendant is not able to get to the bottom of the situation without relevant documentation, a very surprising claim as 1) Defendant had previously claimed to have investigated the matter, 2) Plaintiff has responded to all of Defendant's requests for documentation (even though Defendant tried to redirect Plaintiff to the insurer), and 3) the simple fact no outstanding requests for documentation exist. Defendant

simply can not have it both ways – deny coverage (while claiming to have conducted a thorough investigation) on one hand while claiming a lack of access to documentation on the other.

63. In July 2004 through extraordinary and persistent hard work and a great deal of arm-twisting of HealthNet, it was finally determined with absolute certainty that Defendant – in fact – did change health insurance carriers *retroactively*, i.e. *after* the date Plaintiff had received treatment. This fact along with a brief account of the retroactive cancellation was finally shared by HealthNet after first trying to hide this information from Plaintiff. The exact date of Defendant's retroactive cancellation of its plan with HealthNet is no longer a point of contention and will readily be substantiated once this case proceeds to trial.

64. This singular fact – that Defendant's action to cancel its plan with HealthNet was both retroactive and *after* Plaintiff had already received treatment – is paramount given 1) its obvious implication coupled with 2) Defendant's clear efforts to conceal, misrepresent, and even lie about this fact to Plaintiff. This day in mid-2004 is the first day Plaintiff is actually aware with absolute certainty of the *exact* date his health insurance was cancelled in 2002, almost two years after the fact !

65. The above fact is central to this case before the Court for the following two reasons. First, these is now no doubt the carrier change occurred *after* the actual date of treatment – Plaintiff would, naturally, have to have been clairvoyant in order to either foresee or anticipate Defendant's carrier change. Second, there is a clearly demonstrated history that *identical* treatments were approved, covered, and paid for by HealthNet in months prior to September 2002, making very clear the implicit and reasonable expectation on Plaintiff's part that coverage would continue as long as

necessary (just so long as Plaintiff paid his COBRA premium in a timely fashion).

66. It is important to note the 'retroactive' nature of Defendant's carrier change has been ascertained with absolutely _no_ assistance on the part of Defendant. In fact, Defendant continues to this day to outright refuse to provide answers to such simple questions as "*When was it, i.e. what date was it, Enkata actually informed HealthNet of Enkata's decision to cancel its plan with HealthNet ?*"

67. Furthermore, Defendant generally asserted May 2004 that 'treatment happened after the change'. This is clearly a fraudulent assertion on Defendant's part as Defendant was already well aware of both the timing of treatment and the date of Defendant's carrier change. It is simply inexcusable that Defendant can go to such length to misrepresent the truth, lie, and evade and obstruct its fiduciary obligation to honor past benefits. Note, the above is all while Defendant has *steadfastly refused* to provide related information, such as the date the plan was cancelled, despite repeated / extensive requests – both in writing as well as by phone – that Defendant produce / share such information. (It is further contended that the date on which a plan was cancelled – a factor that has *direct* impact / bearing on an individual's health insurance policy – should reasonably and immediately be shared upon request in accordance with the fair access to such information as proscribed under the Law.)

68. Defendant and Defendant's lawyers make several assertions in May 2004, two of which are as follows. In a letter dated May 26, 2004, Defendant's lawyers assert that ". . *the at-issue services were provided after Enkata change in carriers* . ." [Grammatical error in original text] and that only the date of "*fall of 2002*" is offered in reference to the timing of Defendant's carrier change, the later of which is especially odd given the extraordinary date-specificity of the rest of the letter.

Plaintiff responded with corrections and / or clarifications on these and other points, expecting a response in writing to the points raised as 1) the first assertion is outright false and 2) the second assertion is misleading at best and intentionally misrepresentative of the truth at worst, aside from being vague beyond the point of usefulness. No response was ever received.

69. Defendant and Defendant's lawyers failed to respond to such simple questions but not limited to the following:

*"When was Blue Shield actually informed of Enkata's choice to retroactively enroll its plan with Blue Shield ?"*

*"When, i.e. what date, was the cancellation of HealthNet's plan actually made / processed (not when it was made effective) ?"*

*"When was it, i.e. what date was it, that Enkata first learned I had been mishandled (aside from Enkata's obvious original failure to both advise and include me in the retroactive carrier change process) ?"*

*"For the record, what is Enkata's explanation / excuse for not having contacted me regarding the situation once Enkata learned I had been mishandled ?"*

*"How was the retroactive cancellation communicated to those impacted by the retroactive cancellation ?"*

70. Defendant – to this day, now two-and-a-half years after having created the problem to begin with – still refuses to answer the very simple question,

> *"When was it, i.e. what date was it, Enkata actually informed HealthNet of Enkata's decision to cancel its plan with HealthNet ?"*

## ENUMERATION OF OFFENSES

71. The following paragraphs enumerate point-by-point Defendant's known offenses in relation to this case.

72. First, Defendant failed to notify Plaintiff of Defendant's retroactive cancellation of its health insurance plan with HealthNet. Defendant did not notify, consult, or engage Plaintiff in any way whatsoever and by doing so failed in its core duty to advise plan participants of the plan's status. This is despite Plaintiff having approached Defendant numerous times attempting to learn what had happened after learning for himself that *past* benefits were suddenly not being honored. This failure is clear-cut, both by virtue of the obvious facts of the case and the admission – on two occasions – to the EBSA where Defendant admits failing to notify Plaintiff and – in one occasion – goes as far as to acknowledge that Defendant faces *"responsibility for failure to send a timely notification of change of policy"*. For Plaintiff to have learned on his own of his health insurance plan's cancellation is bad enough but to have expended so much effort to get to the bottom of the situation and have Defendant *still* not even admit the basic facts / circumstances of what happened is appalling and represents a gross violation of fundamental health benefits administration directives as proscribed by Federal Statute.

73. Second, Defendant failed to notify Plaintiff of Defendant's retroactive enrollment of a different health insurance plan with Blue Shield. The events of cancellation and enrollment were separate and distinct and, thereby, this failure is another failed obligation on the part of Defendant that is significant in its own right. Had Plaintiff been properly notified of the enrollment, it would have been possible for Plaintiff to make knowledgeable and timely decisions regarding his health care consistent with Plaintiff's right (and Defendant's obligations) as proscribed by Federal Statute. This failure stripped Plaintiff of his rights to elect (or decline) health insurance under COBRA and prevented Plaintiff from ensuring a course of action that would restore past benefits Plaintiff had already counted on to cover expensive treatment but that had been retroactively 'taken away' by Defendant's actions. This failure of Defendant coupled with the failure to provide any meaningful resolution – Blue Shield denied coverage, and the benefits remain unfulfilled – represents a serious transgression by Defendant in failing to advise Plaintiff of his rights to elect continued coverage under COBRA.

74. Third, Defendant failed to produce a Letter of Credible Coverage substantiating the existence of coverage to the point health insurance was retroactively cancelled. By retroactively taking it upon itself to conduct a retroactive carrier change, Defendant accepted the duties and responsibilities as plan administrator and was, thereby, responsible for producing (or seeing to the production of) a timely Letter of Credible Coverage. Even a timely generation of a Letter of Credible Coverage would have alerted Plaintiff to the retroactive cancellation of his health insurance and 'focused' the matter (rather than Defendant having left Plaintiff to flounder while learning bit-bit-bit over an extended period of time what had happened). Failure to produce a Letter of Credible Coverage is in-and-of-itself quite a serious offense of fundamental health benefits administration directives as

proscribed by Federal Statute.

75. Fourth – and quite severely – Defendant failed to recognize and honor its fiduciary responsibility to restore / 'make whole' any and all adverse affects on past benefits impacted by the retroactive nature of the carrier change.  It goes without saying no two plans are necessarily identical in every respect.  Plaintiff – in trying to recover from a very serious illness – had been receiving on-going treatment, treatment that was approved and covered by HealthNet, the original insurer, and would have obviously been covered had Defendant not retroactively interfered with Plaintiff's benefits. It was Defendant's clear duty and responsibility to accept responsibility for its action, regardless of original intent or circumstance, and too see to it that the matter was expeditiously resolved.  It was, however, Defendant's demonstrated behavior to 1) at first acknowledge and then disavow all responsibility to Plaintiff, 2) hide facts and information that would normally be shared or to which Plaintiff is legally entitled, 3) misrepresent and even in some cases lie about well-established facts and information, and 4) continually ignore restoration of the obvious 'gap' in benefits only created by Defendant's actions.  Defendant has clearly imposed a retroactive liability on Plaintiff that is neither fair nor, more importantly, legal.  Given that this matter remains outstanding, this is an egregious offense of directives regarding responsible plan administration as proscribed by Federal Statute.

76. Fifth (and separate for the fiduciary aspect), Defendant generally and comprehensively failed to administer its health insurance plan with "*the care, skill, prudence, and diligence*" expected under the Law.  Those who administer health insurance plans (just as Defendant did) are obligated to be proactive and responsive in *ensuring* proper administration.  Often times, penalties are assessed merely by virtue of the employer not being able to *prove* they did something specific, i.e. absence

of signed forms, et cetera that fail to substantiate the employer's claims. Case law clearly shows the burden of proof to be not on the employee but actually on the employer in almost all cases as this portion of the Law is meant to actually *force* those who sponsor health insurance plans to be *proactive and fully responsible for error-free administration of the plan*, a very high standard but one very purposely affixed into existing Law. Defendant ignored repeated inquires from Plaintiff when Plaintiff first approached Defendant and failed to share, then hid, and then even in some cases lied about facts and information to which Plaintiff is normally or legally entitled. This is in addition to the clear fact Defendant refused to acknowledge, consider, or even investigate a very simple and elementary fact – that *identical* treatment had been both approved and covered in prior months – clearly not the reasonable behavior of anyone expected to exhibit a reasonable level of "*care, skill, prudence, and diligence*".

77. Sixth, Defendant cancelled its health insurance plan with HealthNet in specific and direct conflict with the terms of the annual insurance contract only signed in August 2002, which clearly states that cancellation of the Plan may only be made with a 30-day written notice. No mention of such notice has ever been asserted by Defendant, nor do the facts support any alternative situation than that the 30-day written notice was required. In fact, it is a well-substantiated fact this clause of the recently signed contract was completely and utterly ignored not just by Defendant but also by HealthNet, the later of which may also bear responsibility for this transgression. Had Plaintiff been provided with a copy of the contract when it had been signed, he would have been ensured – in writing – that the very series of problems that carry to this very day were not possible under the terms of the contract. Not only was Plaintiff not notified, not only did Defendant disavow any responsibility for causing the problem in the first place, the actual contract in place at the actual time of treatment forbade such action as retroactive cancellation of the plan ! Plaintiff implicitly

depended upon this contract being honored, just as millions of other individuals depend on such health insurance contracts on a daily basis. Failure to honor the contract as signed except under exceptional conditions, e.g. bankruptcy, is an abuse of Plaintiff's rights merely for the sake of Defendant's convenience.

78. Seventh, Defendant failed to produce relevant documentation upon demand. This includes copies of plan documentation, which had been withheld for a period extending 21 months, only after the case had already been filed in United States District Court (and well after repeated references to Defendant of Plaintiff's preparation to take legal action). Furthermore, Defendant failed to share / produce extraordinarily simple information to which Plaintiff is legally entitled. To wit, Defendant continues to refuse to answer even the very basic question, *"When was it, i.e. what date was it, Enkata actually informed HealthNet of Enkata's decision to cancel its plan with HealthNet ?"*, or even provide a simple timeline of events explaining what happened and when. This is simply inexcusable behavior, behavior which clearly defies explicit responsibilities of the Defendant and behavior that ignores Plaintiff's rights to fair access to such information. Responsibility to offer such information is an explicit duty of Defendant, and Defendant's failure in this specific respect is an egregious violation of the duties proscribed by Federal Statute.

79. Eighth, Defendant conducted what can only be considered a fraudulent 'medical review' of the situation in late 2003. The review took only 48 hours to conduct and did not solicit additional information from either the Plaintiff or treating physician. Furthermore, the 'medical review' in the end asserted a 'not medically approved / necessary' basis for denial despite 1) there being a clear and demonstrated history of coverage for *identical* treatment in prior months and 2) the apparent lack of any objective assessment of the matter. The 'medical review' appears to have

been conducted by personnel with a vested interest in Defendant's balance sheet (not Plaintiff's welfare), by personnel with administrative duties to the plan, and by personnel with absolutely no medical background. Defendant was even directly advised by the EBSA that an insurance agent's hypothesis or theory is not adequate grounds for denial of benefits and that an arbitrary denial may be a violation of ERISA. Regardless, the mere fact *identical* treatment had been covered in prior months makes moot any outcome of any 'medical review', which only goes to make the outcome all the more offensive. Given Defendant's claims to have investigated the matter, which Defendant has asserted throughout, Defendant would have eventually arrived at only a more detailed but supportive rationale for honoring Plaintiff's past benefits despite Blue Shield's denial. Instead, Defendant claimed to have investigated the matter while merely 'lifting' Blue Shield's denial and using it as Defendant's own rationale to deny benefits. (This is evidenced by Defendant's having highlighted just the one the section where Blue Shield explains its denial in the documentation later returned to Plaintiff.) Furthermore, Plaintiff has repeatedly requested of Defendant and Defendant's lawyers an explanation of this process, i.e. who was involved, what happened and when, et cetera, by which Defendant decided to deny benefits to which no response has ever been received. While admittedly technical, Defendant clearly asserted a 'not medically approved / necessary' rationale for denial without actually working to understand the actual case at hand or acknowledging facts Defendant was regularly advised of. To do so with any measure of authority would necessitate 1) involvement of someone with a medical background as well as an 2) appreciation of not just the illness but also 3) the treatment. Defendant voiding at least two if not all three of these obligations. Clearly by asserting a 'not medically approved / necessary' denial Defendant ignored Plaintiff's rights to seek out and secure coverage for the best available treatment justified on medical – not administrative – grounds.

80. Ninth, Plaintiff was enrolled in a PPO plan, which enabled Plaintiff to obtain limited coverage for any care delivered by any physician regardless of 'in' or 'out of network' status. At the very least, this element of Plaintiff's plan ensured that – at an absolute minimum – Defendant is obligated for a lion's share of the cost of treatment. Defendant has, in essence, not only retroactively 'taken away' Plaintiff's approved benefit but also taken away a much more fundamental component of Plaintiff's health insurance, that any and all medical costs and treatment are covered to varying degrees depending upon the 'in' verses 'out of network' status of the related care. Therefore, without any question, Defendant has always been obligated to cover at least some portion of the past benefit, regardless of the specific circumstances involved. This is yet another instance of Defendant's gross misconduct and how fundamental components of Plaintiff's health insurance were 'taken away' as a direct result Defendant's actions.

81. Tenth, Defendant and Defendant's lawyers failed to offer an explanation of denial that comports with the fact *identical* treatment in prior months had been approved and covered by HealthNet. Defendant and Defendant's lawyers have been both advised of this fact, and Plaintiff repeatedly requested of both Defendant and Defendant's lawyers a *"detailed explanation signed-off by both .. . [Defendant and Defendant's lawyers] . . . making clear the basis for denial of benefits"*. No response has ever been received. Defendant and Defendant's lawyers' apparent refusal to offer any explanation that comports with well-substantiated, historical fact is a flagrant violation of expected health benefits administration practices, which are predicated on an appreciation of the truth, not self-serving opinion. The requirement to provide an explanation for denial is also a clearly proscribed directive of Defendant and Defendant's lawyers, and failure to have complied is a gross violation.

82. Eleventh, a good-faith contract was entered into when Plaintiff paid his premium in both a timely manner and as he had in prior months. Plaintiff reasonably expected continued coverage for on-going treatment that was *identical* to that received and covered in prior months. While coverage was originally delivered by HealthNet, Defendant assumed responsibility for outstanding coverage when it retroactively cancelled its plan with HealthNet. Defendant has engaged in what's termed in the industry as 'post-claim underwriting' and has breached the good-faith contract assumed by Defendant at the time it retroactively cancelled the plan with HealthNet. Rather than Defendant searching for justification to make payment on the past benefit, Defendant only sought opinion geared toward defeating the claim and, thereby, breached the general covenant of good-faith and fair dealing. In doing so, Defendant clearly placed its own interests over that of Plaintiff's and, as a result, generally and comprehensively failed in its duty to Plaintiff. Defendant's position to date is – effectively – to have expected Plaintiff to have been clairvoyant of Defendant's carrier change in order to avoid a problem not yet created by an unforeseeable future event (rather than continue to rely on good-faith in the health insurance he paid for and reasonably expected would continue to cover on-going treatment).

83. Twelfth, in conducting its haphazard 'medical review', Defendant has made reference to contact with HealthNet and has likely had contact with Blue Shield and perhaps other independent agents. While Plaintiff would have worked in good-faith with Defendant toward an amicable resolution to the matter, it's now clear, especially in light of Defendant's pattern of behavior, that Defendant's actions to investigate the matter, while now woefully inadequate, were necessarily required by law to involve Plaintiff for – as Plaintiff has come to understand the Law – Defendant had no rights to inquire about or investigate Plaintiff's medical history without a HIPAA release signed by Plaintiff releasing full or partial records to Defendant for review. This aspect is still unclear to this day as,

on the one hand, Defendant's 'medical review' is clearly flawed but, on the other, Defendant has made repeated reference to HealthNet and possibly other outside agents in possession of private medical information. What information may have been gathered or, more distressing, shared with personnel with no rights of access is something the HIPAA release is meant to prevent and / or control in the privacy interests of the patient. This point is worthy of review on its own merits.

84. Thirteenth, while not as well understood as Plaintiff would like, there are regular references in authoritative resources that allow in some cases for individual personnel to be held personally responsible for egregious transgressions. Plaintiff asserts that this case warrants consideration commensurate with the above, and Plaintiff hereby identifies the following individuals as having participated in this matter in direct association with Defendant. They are (in no particular order) the following: Mr. Peter Caswell, President & CEO; Mr. Michael Chen, COO (former President & CEO); Mr. Randy Heppner, Controller (former); Ms. Leticia Angeles, HR / Office Manager; Mr. Patrick Sherman, Fenwick & West LLP (Defendant's counsel); Mr. Raymond Hixson, Jr. Fenwick & West LLP (Defendant's counsel); Mr. Wayne Boulais, Board Member / Investor (General Partner, Apex Venture Partners); and Mr. Perry Wu, Board Member / Investor (General Partner, ComVentures).

85. Plaintiff did not cause this problem to begin with, Defendant did. Plaintiff did not obstruct good-faith efforts to remedy the situation, Defendant did. Plaintiff only sought the benefits he had paid for / reasonably expected, and to be dealt with fairly and honestly. In contrast, Defendant all on its own *retroactively* cancelled its plan with HealthNet and, thereby, *adversely* affected Plaintiff's *past* benefits. In contrast, Defendant failed to advise Plaintiff of *any* event of which Defendant was obligated to notify Plaintiff. In contrast, Defendant utterly failed to either proactively involve

itself or respond in any useful and / or appropriate manner (or respond at all in most cases) when

Plaintiff repeatedly brought the matter directly to Defendant's attention. In contrast, Defendant

refused to explain what had happened, the timing of events, or even produce basic documentation

Plaintiff is entitled to. In contrast, Defendant both abused and failed to properly execute a review

of the situation that should have sought reasons to honor Plaintiff's past benefits, not deny them.

In contrast, Defendant mislead and even went as far as to lie about critical facts and information,

and in contrast, Defendant abused Plaintiff's good-faith gestures by not working to acknowledge

responsibility or correct its errors regardless of intent or circumstance and instead working to find

any means to deny benefits rightly owed Plaintiff and further evade and obstruct fair resolution of

the matter. Defendant has completely and utterly abused – to its own ends – its purpose and role

in administering its health insurance plan and must be held in full account for both its behavior and

all its egregious violations of clearly established and well-adjudicated directives directly related to

Defendant's comprehensive failures in administering its health insurance plan from 2002 onward.


86. In summary, two points worth repeating are 1) the simple fact is this problem is both one entirely

caused by Defendant and 2) a problem that very easily could have been avoided <u>but that has since</u>

<u>grown into a series of egregious violations only because of Defendant's pervasive misconduct</u>, a

point made only to emphasize the poor behavior and gross misconduct by Defendant in not either

properly avoiding or addressing the problem once it was brought to its attention. In fact, this

matter would not have been a problem at all if Defendant had simply handled its carrier change in

an appropriate manner. If Plaintiff had simply been informed of Defendant's carrier change in a

timely fashion or – with respect to the *retroactive* nature of the carrier change – if Plaintiff had

simply been notified that Defendant was merely *considering* a carrier change, Plaintiff would have

taken action – <u>and very likely quite dramatically different action</u> – to avoid any even *potential*

problems.  As proof, plans were well underway by September 2002 to transition to different

insurance with another carrier – a change that could perhaps have been made sooner if Plaintiff

had only known of the situation in time rather than being left to learn about it through his own

efforts much later.  That stands in stark contrast to the fact Plaintiff has yet to be provided – now

over two-and-one-half years later – with an accounting and / or explanation of the process (or

lack thereof) conducted in late 2002 to change carriers, any follow-through by Defendant on

Defendant's acknowledgement of responsibility (which it then backed away from), or even simple,

basic historical information in Defendant's possession, let alone restoration of the actual benefits

that were paid for in good-faith and were in place at the time of treatment.  Denial of coverage

that was both paid for and in place at the actual time of treatment is tragically flawed, a fact that

has been communicated to Defendant on many occasions to no avail, and subsequent behavior of

Defendant is inexcusable and _exactly_ what the Law is designed to punish.

87. And yet, what was Defendant 'up to' during the timeframe surrounding September 2002 ?  Well,

   Defendant was celebrating its having raised $8,000,000 – That's $8,000,000 in light of utterly,

   persistently, and stubbornly failing in Defendant's duties / responsibilities to properly administer

   its health insurance plan.

88. And what has Defendant done since ?  Well, in late 2004 Defendant "received a major round of

   venture funding" as announced on its new website.  While Plaintiff sincerely wishes Defendant all

   the best in business, Plaintiff is all the more appalled by Defendant's behavior, especially given

   that Defendant has so many resources to ensure it does things _right_ (rather focus its time, energy,

   and resources on avoiding its obligations and ignoring its responsibilities at all cost).

**Failure to Notify of Enrollment in New Plan**

$103,620 in mandatory penalties associated with non-compliance of clearly established ERISA and COBRA guidelines requiring Defendant to have notified Plaintiff of the enrollment of a new plan with Blue Shield. A good-faith reduction in this figure is not offered given the outstanding status of the matter and the fact the continued lack of coverage was entirely caused by Defendant's – and only by Defendant's – own decision to retroactively change carriers yet at the same time not inform Plaintiff. The above figure is computed using the statutory penalties outlined in ERISA Section 502(c)(3) – if identified correctly – which requires a plan administrator to either meet the notice requirement or face statutory liability in the amount up to $110 per day from the date of such failure.

**Failure to Produce (or See to Production of) Letter of Credible Coverage**

$23,100 in mandatory penalties associated with non-compliance of clearly established HIPAA guidelines requiring the timely generation of a Letter of Credible Coverage. A Letter of Credible Coverage was not provided in a timely manner despite Plaintiff's protracted efforts to obtain one. Any efforts were further confused / confounded by Defendant's failure to offer proper notification of the related carrier change, thereby directly hampering Plaintiff's ability to accurately understand the situation. A good-faith reduction in this figure is not offered given the now clear bad-faith exhibited by Defendant. The above figure is computed using statutory penalties outlined in ERISA – if identified correctly – which requires a plan administrator to provide a Letter of Credible Coverage or face statutory liability in the amount up to $110 per day over the period of such failure. If the above should turn out not to be the right penalties to assess, Plaintiff yields to the Court's opinion on the proper statute upon which to rely for appropriate statutory penalties.

**Failure to Fulfill Fiduciary Responsibility to Plaintiff**

$103,620 in mandatory penalties associated with non-compliance of clearly established ERISA and COBRA guidelines regarding Defendant's failure to see to its fiduciary responsibility toward Plaintiff. It is clear from fact, not interpretation, that Defendant refuses to honor benefits clearly in place at the time of treatment. Past benefits were adversely affected <u>only by Defendant's own actions</u> and not by anything Plaintiff did (or failed to do). Defendant, Defendant's agents, and Defendant's lawyers have repeatedly and regularly been advised that *identical* treatment was approved and covered in prior months. A good-faith reduction in this figure is not offered given the outstanding status of the matter and the following facts: Defendant has been repeatedly advised of the facts and circumstances surrounding coverage of prior treatment yet Defendant has chosen to ignore this very basic and fundamental fact. The above figure is computed using the statutory penalties outlined in ERISA, which obligates a plan administrator to see to its fiduciary responsibility or face statutory liability in an amount up to $110 per day from the date of such failure.

**Failure to Properly Administer Plan with "*Care, Skill, Prudence, and Diligence*"**

$103,620 in mandatory penalties associated with non-compliance of clearly established ERISA and COBRA guidelines regarding proper administration of Defendant's plan. Guidelines make clear that employers must execute their duties with "*care, skill, prudence, and diligence*" by both taking proactive action in *ensuring* proper administration and being responsive to problems once they are raised. The simple fact coverage still remains an outstanding matter says enough to Defendant's total lack in proactiveness and responsiveness. A good-faith reduction in this figure is not offered given the outstanding status of the matter and the following facts: Defendant has

been given many numerous opportunities to 'come clean' on this, Defendant has not 'come clean' on this, Defendant has caused very real damages by virtue of not addressing the matter in a timely fashion, and Defendant has forced Plaintiff to file a lawsuit in order to see the matter resolved. A 'good' employer would never have allowed such a problem to occur. A 'reasonable' employer would have immediately addressed the matter once it was brought to their attention. Defendant has demonstrated the behavior of neither a 'good' nor 'reasonable' employer in this regard and has instead created and perpetuated a problem that was both a reasonably foreseeable and even predictable outcome of effecting a *retroactive* carrier change. The above figure is computed using the statutory penalties outlined in ERISA Section 502(c) – to the extent citied correctly – which obligates a plan administrator to either administer their plan with the care, skill, prudence, and diligence required or face statutory liability in an amount up to $110 per day from the date of such failure.


**Breach of Health Insurance Contract Signed August 2002**

An unspecified amount in relation to Defendant's sudden breach of its health insurance contract with HealthNet given Plaintiff's clear dependence on the existing plan for continued coverage of on-going treatment. Plaintiff had very clearly been an implicit party to this contract for continued health insurance both in good-faith and with reasonable expectation of receiving continued benefits, and it is untenable to believe the contract was abandoned so suddenly after having been signed in August 2002 despite the 30-day written notice clearly articulated at the very beginning of the contract itself.

**Failure to Produce Documentation**

$103,620 in mandatory penalties associated with refusal to provide documentation and basic information in clear defiance of established ERISA and COBRA guidelines ensuring employee access to such. This violation is clear-cut. Repeated attempts to obtain access to relevant documentation have largely been ignored. There is only one instance of some documentation being made available, but that only occurred after 21 months had already transpired and after this case had already been filed in United States District Court. No good-faith reduction in this figure is offered given the extraordinarily clear obligation Defendant has to provide said documentation. The above figure is computed using the statutory penalties outlined in ERISA Section 502(c)(1) – if identified correctly – which obligates a plan administrator to either furnish specified documents within either 30 days of written request of a plan participant or clear obligation to do so or face statutory liability in an amount up to $110 per day from the date of such failure.

**Defendant having Conducted a Fraudulent 'Medical Review'**

If it is found that a fraudulent 'medical review' was conducted, then relief appropriate to that offense is sought. This is considered to be a very serious offense, but it is unknown at this time what penalties may specifically exist in the respect.

**Failure to Honor PPO Aspect of Plaintiff's Benefits**

An unspecified amount in relation to Defendant's specific failure to honor aspects of Plaintiff's past benefits that allowed Plaintiff to see any Doctor he choose and that would have naturally covered treatment to at least some degree, regardless. At an absolute minimum, Defendant was without question obligated for a lion's share of the cost of treatment. By not even making this payment, Defendant has 'taken away' an even more fundamental component of Plaintiff's health

insurance, that any and all medical costs and treatment are covered to at least some degree. This is a distinctly gross violation regardless of the circumstances involved in this case, and the Court is asked to set some appropriate penalty in specific regard to this component of the Relief.

## Failure to Provide Explanation

Plaintiff requests the Court's consideration of Defendant's clear violation in not having provided an explanation of denial that takes into account basic, historical facts. Defendant's behavior in this and other related matters can only be reasonably characterized as an intent to evade and even obstruct Defendant's responsibilities, and Plaintiff requests that the Court take this demonstrated behavior into account when considering proper remedy.

## Failure to Follow General Covenant of Good-Faith and Fair Dealing

An unspecified amount in relation to Defendant's violation of Plaintiff's good-faith entry into an implicit agreement for health insurance. Plaintiff paid for and reasonably expected coverage of on-going treatment, and Defendant violated that trust when it effectively engaged in 'post-claim underwriting', searching for reasons to defeat Plaintiff's claim rather than searching for any good cause to make payment on the past benefit. By doing so, Defendant breached the covenant of good-faith and fair dealing made implicit by Plaintiff's good-faith purchase of health insurance. Clearly, Defendant placed its own interests over that of Plaintiff's and, thereby, must be held accountable for this action.

## Suspected HIPAA Violation

In particular, unauthorized possession of medical information is offered as an added offense as HIPAA guidelines clearly establish the manner in which access to private medical information may

be obtained. If it is found that a HIPAA violation occurred, then relief appropriate to that offense is sought. It is unknown at this time what penalties may specifically exist in this respect.

**Personal Liability**

With respect to the individuals mention herein and should it become clear any or all of them may be held accountable for personal liability, an unspecified amount in relation to and commensurate with each individual's transgression(s) is requested. It is unknown what specific guidelines exist with respect to such liability extending to a personal level, but Plaintiff considers this remedy worthy of consideration given the inexplicable, illogical, and – at times – untruthful behavior of various individuals involved ranging from but not limited to: ignoring clear and well-substantiated facts; failure to act; misrepresentation of the truth; failure to answer simple and direct questions; having conducted a fraudulent review of the situation; and refusal to produce general facts and information to which Plaintiff is entitled, any of which is a serious failure at a personal level when conducted through the course of administering a health insurance plan.

**Restitution of Outstanding Medical Liabilities**

Immediate restitution (with interest) of benefits approved at the time of treatment yet still denied by Defendant.

**General Restitution**

$25,000 to compensate Plaintiff for the time and attention this matter has consumed. To date, over 500 hours have been invested in working directly and indirectly with Defendant to resolve this matter and well as forwarding this case in United States District Court. This time could have been put to much better and productive use but was consumed by this matter given the very real

and pressing requirement to obtain resolution in order to protect and maintain access to future treatment. This award would rely on ERISA Section 502(g) – if identified correctly – which would reasonably allow for the retroactive recovery of costs leading up to the action given the clearly demonstrated poor behavior and gross misconduct of Defendant and its efforts to avoid its clear plan administration responsibilities at all costs.


## Cost of Legal Proceedings

An unspecified amount in relation to the added time and cost associated with ultimately having to proceed with a lawsuit. Generally, this would be considered 'attorney's fees'. Given the Pro Se nature of this case, these fees are requested in lieu of Plaintiff's own efforts. This award would rely on ERISA Section 502(g), which allows for recovery of costs (time and expense) related to the action itself, and in this case, especially those related to the added Pro Se duties related to the overall action.


## Extraordinary Stress and Undue Hardship

$50,000 in punitive damages associated with the very real impact this matter has had on Plaintiff's increased stress and overall healthcare situation, including but not limited to the jeopardy and uncertainty surrounding Plaintiff's continued access to treatment in light of unpaid medical bills. Medical treatment has helped Plaintiff regain a measure of health not known since late 2001, and actions on the part of Defendant have unnecessarily placed Plaintiff's continued treatment and health at risk on an on-going basis. Naturally, this has created a tremendous amount of incredible stress and frustration for Plaintiff and does so on a daily basis, <u>especially given the deliberate and protracted effort Plaintiff exerted despite his illness to ensure / safeguard benefits **and avoid such an exact problem as this**</u>. Plaintiff was, after all, very seriously ill at the time and was clearly in

need of the benefits he paid for and rightly expected.  <u>Defendant's behavior has since introduced</u>
<u>an element of uncertainty in Plaintiff's healthcare situation that is intolerable and outright illegal</u>.
This award would rely on penalties outlined in ERISA Section 502(c)(3) – if identified correctly –
which states the court may in its discretion order such other relief as it deems proper.


**Other**

Any appropriate amount(s) for any added remedies that are naturally and obviously drawn from
this case or that surface throughout the process of Discovery or the Trial itself.


**Attorney's Fees**

Attorney's Fees should Plaintiff ultimately be represented or assisted by Counsel.

| | |
|---|---|
| Signature | |
| Name | MARK FELLENZ, PRO SE |
| Address | 95 LANGLEY ROAD #1<br>NEWTON CENTER, MA  02459 |
| Telephone | 857-205-5742 (cellular) |

TO ULTIMATELY FILE IN A COURT OF LAW. CO IS IN CA. 11/28/03 @2:30PM, I SPOKE TO P. I TOLD P THAT I STILL HAVE NOT RECEIVED HIS PAPERS. P HAS A LAPSE IN COVG. HOWEVER THE INS CO (PERHAPS FULLY INSURED PLAN) THAT HAS TAKEN OVER RETROACTIVE TO 09/01/03 HAS DENIED P'S CLAIMS, CLAIMING THAT THEY WERE NOT MEDICALLY NECESSARY. AT THE TIME THAT P WENT FOR THESE BENEFITS, HE HAD NO IDEA THAT THE BENEFIT WAS NOT COVERED AND THAT HIS CO' HAD LAPSED. THE PLAN NEVER NOTIFIED PS. THE PLAN IS IN VIOLATION OF THE NOTICE REQUIREMENT. I MUST ASK THE PA IF THIS IS A SELF INSURED PLAN. IF SELF-INSURED PLAN. P SAID THERE IS ONLY ONE CLAIM AT ISSUE. P WILL FAX ME COPY OF THE CLAIM. W/ THE NAME OF DIRECTOR OF HR AND HIS HIM SO I CAN FIND OUT WHO THE PA MAY BE. P HAS APPEALED. P'S FIRST APPEAL WAS DENIED. P'S SECOND APPEAL IS PENDING. P IS BELIEVING THAT THE SECOND APPEAL WILL BE DENIED SOON. 12/01/03, I RECEIVED P'S FAX. P HAS A LETTER INCLUDING THE UNPAID HEALTH CLAIM AND THE NAME OF THE PA. PA-RANDY HEPPNER, CONTROLLER @650-227-6500. @11:00AM, I LEFT PA A DETAILED MSG AND REQUESTED A CALL BACK. @11:00AM, I ADVISED P OF THE ABOVE. 12/02/03 @1:10PM, I SPOKE TO PA, MR. HEPPNER. MR. HEPPNER ADMITTED THAT P WAS NEVER NOTIFIED OF THE CHANGE IN INS CARRIER. WE DID NOT DISCUSS THE ORIGINAL LOSS OF COVG. PA STATED THAT THE CO HAD MADE A DECISION THAT SINCE P WAS NOT NOTIFIED OF THE CHANG IN THE PLAN AT THE TIME HE SOUGHT THIS PARTICULAR BENEFIT, THE PLAN WOULD PAY FOR P'S BENEFIT IF THE PLAN DETERMINED THAT THIS PARTICULAR BENEFIT WOULD HAVE BEEN COVERED BY THE PREVIOUS PLAN. PA STATED THAT HIS INS CARRIER HAD TOLD P THAT THIS IS AN EXPERIMENTAL PROCEDURE AND EXPERIMENTAL PROCEDURES ARE USUALLY NOT COVERED BY THE PLAN AND THAT IS WHY THEY DENIED IT. I TOLD PA THAT ACCORDING TO FED LAW, PAYMENT OF CLAIMS MUST BE BASED O PLAN RULES. INS AGENT'S HYPOTHESIS OR THEORY IS NOT GOOD ENOUGH. PA SAID THAT THE INSURANCE AGENT AND HIS ASSISTANT LATISHA WORKED ON THIS AND PERHAPS THEY COULD RETRACE THEIR STEPS FOR ME. ASSISTANT IS OUT ON VACATIO! UNTIL 12/16/03. AS SOON AS ASSISTANT COMES BACK PA WILL HAVE HER CALL ME S! THEY CAN SHOW ME HOW THE COMPANY MADE THE DENIAL DECISION. I TOLD PA I NEE TO SEE THE PREVIOUS PLAN PROVISION OR BENEFIT BOOKLET THAT SUGGEST THIS SPECIFIC BENEFIT IS EXCLUDED. I TOLD PA THAT AN ARBITRARY DENIAL OF THE CLAIM MAY BE IN VIOLATION OF FED ERISA LAW. @1:20PM, I LEFT P A MSG AND REQUESTED A CALL BACK. (ALTHOUGH P HAS SOME PATHOLOGY DOCUMENT FROM HEALTHNET THAT HE USES AS AN EXHIBIT THAT THIS BENEFIT SHOULD HAVE BEEN PAID IN FULL, I NEED P TO SHOW ME THE BENEFIT BOOKLET OR A STATEMENT FROM INS CARRIER.) PA STATED THAT HE BELIEVES THE ER GROUP HEALTH PLAN IS A FULLY INSURED PLAN B/C THEY ARE A VERY SMALL COMPANY.). CHECKED KDS--NO HITS. CHECKED GSS--NO HITS. HMS--NO HITS. THE PLAN IS BASED IN CALIFORNIA AND THE PA IS IN CALIFORNIA AS WELL. 12/22/03 @2:18PM, LATISHA ANGELES ("ER") CALLED AND STATED THAT SHE IS GATHERING DOCUMENTS FOR ME. SHE ALSO SAID THAT P WAS PAYING COBRA BENEFITS DIRECTLY TO HEALTHNET. I ASKED ER HOW MANY KES THEY HAD HAD THE YR BEFORE AND P SAID THAT SHE HAD TO RUN B/C OF AN EARTHQUAKE. @3:00PM, ER SAID THAT THE REASON FOR THIS PROBLEM WAS B/C AS OF 09/01/03, ER'S FULLY INSURED PLAN CHANGED INS CARRIERS FROM HEALTH NET TO BCBS. ALL PS AND COBRA BENEFICIARIES WERE NOTIFIED AHEAD OF TIME EXCEPT THE ABOVE P. FOR SOME REASON P WAS PAYING HIS COBRA PREM DIRECTLY TO HEALTHNET SO WHEN ER SENT OUT THE NOTICES, THE ABOVE P WAS FORGOTTEN. ER UNDERSTANDS THAT SHE/HE FACES SOME RESPONSIBILITY FOR FAILURE TO SEND A TIMELY NOTIFICATION OF CHANGE OF POLICY TO P. ER HAS ASKED P TIME AND TIME AND AGAIN TO APPEAL THE CLAIM. ER IS WILLING TO CONSIDER PAYING FOR P'S CLAIM IF HIS APPEALS ARE DENIED. P HAS REFUSED TO APPEAL AND HAS SENT AN EMAIL THAT HE HAS ALREADY SPENT TOO MUCH TIME AND HE SHOULD PAY FOR HIS CLAIM. I DISCUSSED ER'S FIDUCIARY RESPONSIBILITIES IN DETAIL AND TOLD ER THAT IF ER FAILS TO PAY FOR THE CLAIM, P HAS THE RIGHT TO SUE ER IN A COURT OF LAW. ER SAYS THAT B/C OF PRIVACY ISSUES, ER HAS NO WAY OF FINDING OUT WHETHER THIS WOULD HAVE BEEN A COVERED BENEFIT UNDER THE OLD PLAN. ER WOULD